IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
---

SHARIF HAMZAH,

                         Plaintiff,                      OPINION AND ORDER

    v.

                                                  13-cv-491-wmc

WOODMAN'S FOOD MARKET, INC.,

                         Defendant.
---

*Pro se* plaintiff Sharif Hamzah brings this suit against his former employer, defendant Woodman's Food Market Inc. ("Woodman's"), under Title VII, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, claiming a hostile work environment and unlawful termination. More particularly, Hamzah claims that Woodman's repeatedly discriminated against him on the basis of his age, race, color or ethnicity. Hamzah also claims that he was fired in retaliation for filing internal complaints about this discrimination. Before the court now are the parties' cross-motions for summary judgment. (Dkt. ##33, 43).[1] After a review of the parties' respective, proposed findings of undisputed facts, the court finds that Hamzah failed to meet his burden of showing a hostile work environment or retaliation. For the reasons explained below, however, the court finds that Hamzah has presented enough evidence to avoid summary judgment on his unlawful termination claims.

---

[1] Plaintiff timely cross-moved for summary judgment as part of his response to defendant's motion for summary judgment.

UNDISPUTED FACTS[*]

A.   Parties

Sharif Hamzah is Native/African American. At 43 years of age, he was hired as a "utility clerk" at the "Madison West" Woodman's on September 2, 2008. Hamzah's responsibilities included assisting customers, as well as retrieving shopping carts in the parking lot and front end of the store.

As a utility clerk, Hamzah worked under Woodman's employees Jacob Bemis, a parcel/carts supervisor, and Gabriel Oruruo, the front-end supervisor. Oruruo is African American. The store manager, Dale Martinson, supervised all employees at the Woodman's Madison West. In his capacity as store manager, Martinson had the ability to hire, fire, discipline and promote employees.

B.   Employee manual

On the date of his hire, Hamzah received a copy of Woodman's General Policies Manual, which he acknowledged by his signature. The manual describes standards of conduct to which Woodman's employees are expected to adhere, including a "Work and Safety Rules" section. That section organizes rule violations under two categories. "Group 1" violations, which include being insubordinate to a supervisor, are the most serious and provide cause for immediate dismissal. "Group 2" violations are considered less serious and do not carry a risk of termination, unless an employee has received more

---

[*] The following facts are deemed undisputed for purposes of summary judgment only, based on the parties' submissions on summary judgment, resolving all disputes in plaintiff's favor as the non-moving party where at least some evidence supports it. *See* discussion, *infra*, n.4.

2

than five disciplinary notices for a Group 2 violation over a twelve-month period. (Policies Manual (dkt. #38-1) 8.)

### C.  Customer complaints and written warnings

While Hamzah disputes the underlying accusations upon which they are based, he acknowledges receiving multiple written warnings for customer complaints and rule violations during his period of employment by Woodman's.

#### 1. Group 1 Violations

During late 2010 and mid-2011, Hamzah received three notices for Group 1 violations, each of which were issued for insubordination.  The first notice, dated November 2, 2010, was issued after Supervisor Bemis claimed that Hamzah refused his commands to assist customers at "parcel."  (An area where employees help customers load groceries into their cars.)  The second notice was issued on May 12, 2011, and came after Hamzah allegedly refused Bemis's instructions to retrieve carts from the parking lot, responding, "I don't want to work that hard."

According to defendant, Bemis then reported Hamzah's conduct to Oruruo, who ordered Hamzah to either retrieve carts or work "at the drive-up" or, alternatively, punch out and go home.  After Hamzah refused these instructions, Oruruo told Hamzah to go speak to Martinson.  Martinson then gave Hamzah the Group 1 notice and warned him that he would be fired if he had any more issues with supervisors or if a customer filed another complaint about him.

3

The third notice, defendant maintains, was the last straw. Defendant alleges that on July 28, 2011, Hamzah replied, "no!" after Bemis told him to stop putting carts into the cart tunnel. Defendant adds that Hamzah also repeatedly interrupted Bemis while he tried to explain why he wanted Hamzah to stop moving carts to the tunnel. At that point, Bemis went inside the store to report Hamzah's conduct to Oruruo and Martinson. Martinson then immediately issued Hamzah a termination notice, citing the November 2, May 12 and July 28 Group 1 violations as the reasons for firing Hamzah.

As with the other disciplinary notices, Hamzah denies the factual accuracy of defendant's record of the events on July 28, but he concedes that Martinson did not consult further with Bemis or Oruruo about his decision to fire Hamzah.

### 2. Group 2 Violations

In addition, Hamzah received multiple Group 2 violations between 2008 and early 2011. On December 3, 2008, a customer filed a complaint with Woodman's, claiming that Hamzah got upset when her daughter brushed snow from her car onto an area of the parking lot from which Hamzah was trying to clear snow. In March of 2009, Hamzah received a second written notice for a Group 2 violation after a customer reported that Hamzah struck him with a string of carts that Hamzah was retrieving from the parking lot. After he received another Group 2 notice for loitering during work hours on November 22, 2009, Store Manager Martinson met with Hamzah to discuss his behavior. Hamzah later received two additional Group 2 notices -- another for loitering on May 28, 2010, and one for ignoring instructions to use a particular cart caddy to gather carts on April 8, 2011.

### D. Hamzah's letters[2]

During 2010 and 2011, Hamzah sent two letters to Woodman's corporate office complaining about his supervisors. In the first letter, dated May 29, 2010, Hamzah provided his account of the Group 2 notice he received for loitering the previous day. In particular, Hamzah recounted that Oruruo became upset and demanded that Hamzah follow him after he suggested Oruruo should speak to the employee who was responsible for covering the parcel pickup area of the store before blaming Hamzah for leaving it unattended. Concerning Oruruo's demand specifically, Hamzah further wrote, "[a]t that point I felt I should get the store manager into the matter because clearly employee Gabriel [Oruruo] had some alternative motive in mind. What that motive was is not clear, but I felt it would be negative towards me."

Hamzah also suggested in his May 29 letter that he received no fairer treatment from Martinson on May 28th. Writing that when he asked whether Martinson's warning that he would be fired were he again caught leaning on the carts only applied to him, Hamzah claimed Martinson "responded by saying it did and that when Gabriel makes a complaint against me it would be considered truth and my version meant nothing." Hamzah concluded the letter with more detail about his relationship with Oruruo:

> In ending I would like to stress that this is not the first time employee Gabriel has come outside and approached me with stares and accusations about my standing in designated work areas in and around the store. This seems to be a pattern that could lead to a deliberate attempt by employee Gabriel, etc., which could lead to my termination of employment based on false and frivolous accusations.

---

[2] The court draws the following facts about Hamzah's letters from the properly authenticated copies submitted by defendant. (Decl. of Kristin Popp (dkt. #38) Exs. H, K.)

5

Hamzah's second letter to Woodman's corporate office arrived on or around April 8, 2011. This letter concerned the disciplinary notice Hamzah received for refusing to use a particular cart caddy. In the letter, Hamzah explained that Woodman's employee David Fields told him to use a different cart caddy because the one Hamzah was using needed to be recharged.[3] According to Hamzah, he explained that the cart caddy he was using *was* charged sufficiently to do the job *and* that the other one did not work properly, but Fields removed the keys from both caddies and told Hamzah to "push [the carts] in by hand."

Hamzah stated in his letter that Fields returned the keys after Hamzah threatened to report his actions to supervisors, but soon after Fields walked inside the store, a front end manager named Kevin came outside to ask what was wrong. Like Hamzah, Kevin also got frustrated after he was unable to get the same cart caddy that Fields told Hamzah to use working properly. Nevertheless, Hamzah claimed, Kevin then went back inside the store and presented Hamzah with a disciplinary notice.

Hamzah concluded this second letter by mentioning another dispute he had with Fields the day before, stating "I would like to categorically deny any false accusations made against me by employees David [Fields] or Kevin that could ultimately lead to a demotion to bagger via safety points because of failure to perform my duties."

---

[3] Hamzah actually referred to a "David F." in his letter, but he specifically identifies a supervisor named David Fields in his other submissions to the court. (Pl.'s PFOF (dkt. #44) ¶¶2, 4.)

E. Alleged Retaliatory and discriminatory statements

Hamzah points to several statements that he alleges were made by Martinson, Bemis and Oruruo in opposition to defendant's motion for summary judgment.[4] With respect to his retaliation claims, Hamzah alleges that Martinson told him at some point after he sent his first letter to Woodman's corporate office that he would be fired if he did not stop making complaints. In support of his discrimination claims, Hamzah alleges that Bemis and Oruruo made discriminatory remarks to him on the last day he was employed at Woodman's. Specifically, Hamzah claims that Bemis told him that "blacks don't work with whites while [I'm] on duty, because you don't belong with us." Hamzah adds that Bemis also told him, "you are too old to work on parcel and carts" before ordering him to remain in the parcel pick-up area for the remainder of his shift, effectively separating him from the "younger employees" who gathered carts.

---

[4] In citing only to his amended complaint in response to its motion for summary judgment, defendant Woodman's correctly points out that plaintiff failed to provide adequate support for his proposed findings of fact concerning these alleged statements under Federal Rule of Civil Procedure 56(c)(1)(A). (Def.'s Resp. PFOF (dkt. #47) ¶¶6, 9, 10.) Despite Hamzah's failure to properly support his proposed finding of fact that Martinson warned him about making complaints (Pl.'s PFOF (dkt. #44) ¶6), however, Hamzah could testify about it, he is acting *pro se* and the defendant does not oppose Hamzah's allegation with a denial from Martinson. Fed. R. Civ. P. 56(e)(2). Defendant also treats the statements allegedly made by Bemis and Oruruo to Hamzah on the date Martinson fired him to be undisputed for summary judgment purposes throughout its brief in support of the motion. (Dkt. #34.) For this reason, the court will likewise consider these statements to be undisputed for purposes of ruling on defendant's motion for summary judgment. Fed. R. Civ. P. 56(e)(2). On the other hand, since he has presented no facts from which he could prove certain assertions by a preponderance of the evidence, the court cannot, nor will it, credit Hamzah's entirely unsupported assertions that: (1) Bemis, Oruruo or any other Wodman's employee made other discriminatory remarks except on the day he was fired (Pl.'s PFOF (dkt. #44) ¶¶9, 10); or (2) supervisors "constantly" interfered with his duties on a discriminatory basis (*Id.* at ¶11).

Shortly after his encounter with Bemis, Hamzah also noticed Bemis talking to Martinson in Martinson's office. According to Hamzah, within minutes of that conversation, Oruruo said to him, "told you, you don't belong to the right ethnic group," then said, "Dale [Martinson] wants to talk to you." As noted above, Martinson fired Hamzah that same day.

OPINION

Summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schnacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Title VII makes it unlawful for employers to "discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA makes it unlawful for employers to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Since Hamzah was over 40 years of age during

8

the entire time he was employed at Woodman's, the ADEA's protections apply to him. 29 U.S.C. § 631(a).

The court granted Hamzah leave to proceed on hostile work environment claims based on his race, color or ethnicity under Title VII and based on his age under the ADEA. Hamzah was also granted leave to proceed on a claim for unlawful termination based on his race, color or ethnicity under Title VII. Lastly, Hamzah was allowed to proceed on retaliation claims under both Title VII and the ADEA. The court will take up each claim in turn.

### I. Hostile work environment

A hostile work environment claim has both a subjective and objective component. Subjectively, Hamzah must perceive the environment as abusive. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). In addition, the environment must be "objectively hostile or abusive." *Id.* at 21. The latter, objective component requires that the conduct underlying the hostile work environment claim is "sufficiently severe or pervasive" that it would materially alter the conditions of employment not just for Hamzah, but for a "typical employee." *Patton v. Keystone RV Co.*, 455 F.3d 812, 815 (7th Cir. 2006). Factors for the court to consider in evaluating the work environment may include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. This analysis applies to both of Hamzah's hostile work environment claims under Title VII and the ADEA. *See*

*Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001) (applying Title VII standard to ADEA hostile work environment claim).

Assuming for purposes of summary judgment that Hamzah could meet his burden under the *subjective* prong of his hostile work environment claims, the record before the court does not show that he was subjected to an *objectively* hostile work environment based on his age, race, color or ethnicity. In particular, Hamzah alleges, and the court will assume for purposes of defendant's present motion, that Bemis made two discriminatory remarks on the day Martinson fired him: (1) "blacks don't work with whites while [I'm] on duty, because you don't belong with us;" and (2) "you are too old to work on parcel and carts." Hamzah also claims that Oruruo said, "told you, you don't belong to the right ethnic group."

In addition to these statements, Hamzah suggests that supervisors frequently and discriminatorily interfered with his job duties, although he only references three such events. (Pl.'s PFOF (dkt. #44) ¶11.) Specifically, Hamzah identifies: the cart caddy incident on April 8, 2011; Bemis's instruction to gather carts on May 12, 2011; and Bemis's command regarding the cart tunnel on the date of Hamzah's termination, July 28, 2011.[5]

To begin, none of the three comments attributed to Bemis or Oruruo, though offensive and demeaning, are sufficiently severe that any one of them could support a hostile work environment claim, at least independently. *See Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005) (finding that "rude and inappropriate" comments touching

---

[5] Hamzah principally points to these events by referencing: dkt. #6 at page 2 (cart tunnel); dkt. #31-1 at page 19 (cart caddy); and dkt. #39-1 at page 1 (Bemis's order to gather carts).

on ignorant stereotypes of male, older and Caucasian employees were not sufficiently severe, as opposed to racial and ethnic slurs that are "so outrageous that a single incident might qualify for a hostile environment claim"). The same is true for the three incidences in which Hamzah claims supervisors interfered with his job duties. *See Hagerud v. Amery Sch. Dist.*, 259 F.3d 678, 694 (7th Cir. 2001) (describing incidents of harassment directed at female plaintiff's conditions of employment as not "particularly severe" when male employees "question[ed] her abilities and the ability of women to do the job in general, plott[ed] to give her job to a male custodian, increas[ed] her duties in an attempt to make her quit, with[held] necessary assistance, hid[] the tools necessary to do her job, ma[de] discriminatory comments, and so forth").

Even so, Hamzah need not show that any individual incident of discrimination he experienced was sufficiently severe to create a hostile work environment on its own. *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002). An extended pattern of lesser harassment can also give rise to hostile work environment liability. *Id*. Taking the three discriminatory statements, combined with the three times supervisors interfered with his work responsibilities, however, does not in the court's view support an inference of discrimination pervasive enough to support Hamzah's hostile work environment claims, particularly given that none of them were particularly severe. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (finding that six discriminatory incidents, including three directly involving plaintiff, over the course of a year and a half were too infrequent to constitute a violation of Title VII); *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 641 (7th Cir. 2001) ("[W]e agree with the district court

that [plaintiff's co-worker's] three verbal utterances (one made in the context of random office banter and two not causally related to the decisionmaking process) do not rise to the level of an objectively hostile work environment.").[6]

Because Hamzah has failed to adduce sufficient evidence to show that the discrimination he was subjected to was severe or pervasive, the court must grant summary judgment to defendant on his hostile work environment claims.

## II. Unlawful termination

Next, for Hamzah to proceed past summary judgment on his claim that he was fired because of his race, color or ethnicity in violation of Title VII, he must come forward with evidence sufficient to satisfy what has become known as the "direct" or "indirect" method of proof. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013). Having presented enough evidence to avoid summary judgment by virtue of the "cat's paw" theory of liability, the court finds that Hamzah has satisfied his burden of proof under the direct method.

The direct method requires a plaintiff to prove that the employer had a discriminatory motivation using either direct or circumstantial evidence. *See id.* In the case of Title VII, direct evidence is "something akin to an admission" from defendant, *id.*

---

[6] Hamzah suggests that he experienced other incidents of discrimination on a frequent (Am. Complaint (dkt. #8) 2, 3) or consistent (Pl.'s Resp. Br. (dkt. #43) 1) basis, but his unsupported assertions are not enough for him to show at summary judgment that discriminatory conduct was pervasive without providing *any* facts detailing the other discriminatory conduct he references. *See Ezell*, 400 F.3d at 1048 ([Plaintiff] testified by affidavit that [his supervisor] made [discriminatory] remarks on a regular basis . . . . [Plaintiff] provides no detail on the regularity and so we cannot consider the few comments detailed in the briefs to be pervasive.").

at 710, while circumstantial evidence requires a plaintiff to construct "a convincing mosaic" that allows a jury to "infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). Circumstantial evidence sufficient to create a convincing mosaic generally falls under the categories of suspicious timing, ambiguous remarks or other miscellaneous facts suggestive of a discriminatory motivation. *See id.* at 711.

"In the employment discrimination context, the cat's paw theory of liability applies when 'a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015) (citing *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 828 (7th Cir. 2014)); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (applying cat's paw theory to Uniformed Services Employment and Reemployment Rights Act). Put differently, under the cat's paw theory, "when a subordinate harbors a discriminatory animus and advises the ultimate decision-maker to take an adverse action against the plaintiff, that evidence can support a claim against the corporate employer." *Smith v. Bray*, 681 F.3d 888, 900 (7th Cir. 2012).

It is undisputed that Martinson was the decision-maker and that he fired Hamzah based on the three Group 1 notices. It is also undisputed that all three of Hamzah's three Group 1 violations for insubordination were based on allegations made by either Bemis or Oruruo. While it is questionable whether Oruruo's statement ("told you, you don't belong in the right ethnic group") amounts to evidence of an illicit motive to have Hamzah fired because of his ethnicity, a reasonable jury *could* find that Bemis's statement

13

("blacks don't work with whites while [I'm] on duty, because you don't belong with us"), allegedly made on the same day that Bemis's allegation of Hamzah's insubordination triggered Martinson's decision to fire Hamzah, is evidence of Bemis's intent to have Hamzah fired because of his race, especially if the jury credits Hamzah's assertion that Bemis lied about the underlying incident.

A decision-maker can break the chain of proximate causation from a subordinate's discriminatory animus to an adverse employment action by making an independent investigation into the circumstances surrounding the subordinate's report, but "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Staub*, 562 U.S. at 421. Here, the court must infer on summary judgment that Martinson met with Hamzah after Bemis or Oruruo reported him for insubordination, but it is not apparent that Martinson went anywhere near the lengths required to investigate whether Hamzah's Group 1 notices were justified *apart from* Bemis's or Oruruo's allegations.

Although they turn solely on Hamzah's credibility regarding the statements Bemis and Oruruo made to him on his final day of employment with Woodman's, there remain genuine issues of material fact as to whether Bemis or Oruruo had a discriminatory animus and supplied the basis for Martinson's decision to terminate Hamzah's employment. *See Eiland v. Trinity Hosp.*, 150 F.3d 747, 752 n.1 (7th Cir. 1998) ("Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that

may have affected the adverse employment action.") (quoting *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994)). Accordingly Hamzah has presented enough evidence under the direct method of proof to avoid summary judgment on his Title VII unlawful termination claims.

### III. Retaliation

Next, Hamzah seeks to establish that Woodman's retaliated against him for filing complaints about harassment on account of his race, ethnicity and age in violation of Title VII and the ADEA. As with a claim for unlawful termination, a plaintiff can make out a prima facie case for retaliation under either a direct or indirect method. Under both statutes, the direct method requires a plaintiff to show that: (1) he engaged in a statutorily protected activity, such as opposing unlawful employment practices; (2) he was the object of an adverse employment action; and (3) the adverse employment action was caused by his opposition to the unlawful employment practice. *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013) (Title VII); *Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 657 (7th Cir. 2012) (ADEA). The indirect method requires a showing that the plaintiff: (1) engaged in statutorily protected activity; (2) met the employer's expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in protected activity. *Northington*, 712 F.3d at 1065; *Smith*, 674 F.3d at 657-58.

Regardless of which method applies, Hamzah must establish that he engaged in statutorily protected activity. However, Hamzah cannot make this showing because the

letters he sent to Woodman's corporate office only complain generically about harassing behavior from supervisors.  By failing to make any reference to facts or to his protected status in his letters, from which one could detect even an implicit reference to discrimination on the basis of his race, ethnicity or age, there are no facts indicating that Hamzah engaged in statutorily protected activity at any time before Martinson fired him. *See Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007) ("To constitute protected expression, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class.  Merely complaining in general terms of . . . harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.") (alteration in original) (internal quotation marks omitted); *see also Peters*, 512 F. App'x at 627 ("Internal complaints constitute protected activity under Title VII only if the employee complains of discrimination on an impermissible ground.").

Even if Hamzah had presented facts that he engaged in statutorily protected activity, his retaliation claims would still not survive.  Under the indirect method, Hamzah has not shown that he was treated less favorably than employees who did not engage in protected activity but were otherwise similarly situated.  As for the direct method, even if the court were to credit Hamzah's claim that Martinson warned him that he would be fired "if the complaints did not stop," Hamzah presents no admissible evidence that Martinson knew about his follow up complaint.[7] *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668-669 (7th Cir. 2006) (affirming district court's grant of

---

[7] Hamzah also offers no evidence that defendant's legitimate, nondiscriminatory explanation for his termination was pretextual.

summary judgment in part because the plaintiff did not present any evidence that the decisionmaker had actual knowledge of his protected activity).

Moreover, the three-month gap between Hamzah's second letter complaining of discriminatory treatment and his firing obviates any inference that the two events were causally connected. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (holding that three-month gap between protected activity and adverse employment action was insufficient for inference of causation in ADEA retaliation claim); *see also Tomanovich*, 457 F.3d at 665. Accordingly, the court will grant summary judgment to defendant on Hamzah's retaliation claims as well.

## IV. Assistance in recruiting counsel

Earlier in this case, the court denied Hamzah's motion for assistance in recruiting counsel without prejudice on the basis that it was premature, because although Hamzah had shown that his efforts to find a lawyer were unsuccessful (dkt. #4-1), the court had not yet granted him leave to proceed on any claims. (Dkt. #5.) Now, having denied summary judgment on Hamzah's Title VII unlawful termination claims, the court will exercise its discretion to undertake the effort to recruit counsel to represent Hamzah at trial. 28 U.S.C. § 1915(e)(1). Although he is neither in prison, nor mentally handicapped, Hamzah has provided enough information to question his ability to represent himself at trial.

That being said, Hamzah should be aware that civil litigants have no constitutional or statutory right to the appointment of counsel. *Ray v. Wexford Health*

*Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013). Moreover, the fact that Hamzah was unable to obtain counsel despite the promise of a statutory fee award in the event that he prevails on his Title VII claim underscores the possibility that the court may not be successful.

Finally, plaintiff should appreciate that should the court be able to recruit counsel, said counsel will take on this representation out of a sense of professional responsibility, which includes representing zealously those clients they take on. Plaintiff, too, takes on a responsibility. For example, all future communications with the court must be through his attorney of record. Plaintiff must also work directly and cooperatively with his attorney, as well as those working at the attorney's direction, and must permit them to exercise their professional judgment to determine which matters are appropriate to bring to the court's attention and in what form. Plaintiff does not have the right to require counsel to raise frivolous arguments or to follow every directive he makes. On the contrary, plaintiff should expect his counsel to tell him what he needs to hear, rather than what he might prefer to hear, and understand that the rules of professional conduct may preclude counsel from taking certain actions or permitting plaintiff from doing so.

If plaintiff decides at some point that he does not wish to work with recruited counsel, he is free to alert the court and end their representation, but he should be aware that it is highly unlikely that the court will recruit a second set of attorneys to represent him.

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #33) is GRANTED in part and DENIED in part, consistent with this opinion;

2) Plaintiff's motion for summary judgment (dkt. #43) is DENIED; and

3) All dates are SUSPENDED pending recruitment of trial counsel for plaintiff.

Entered this 22nd day of January, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge